UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARWA KHUDAYNAZAR, | * * * |
| Plaintiff, | * * |
| v. | * Civil Action No. 25-cv-12696-ADB * |
| CITY OF BOSTON, MICHELLE WU, and LUKE PAYNE, | * * * |
| Defendants. | * * * |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Marwa Khudaynazar ("Khudaynazar") brings this action against the City of Boston (the "City"), its mayor, Michelle Wu ("Wu"), and a police officer, Luke Payne ("Payne"), alleging violations of her civil rights and various state torts and statutes.  [ECF No. 1-3 at 3–25 ("Complaint" or "Compl.")].  Payne, the City, and Wu have moved to dismiss Plaintiff's claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  [ECF Nos. 14, 17, 19].  For the reasons set forth below, Payne's motion is **GRANTED**, the City's motion is **GRANTED IN PART** and **DENIED IN PART**, and Wu's motion is **GRANTED**.

## I.     BACKGROUND

### A.     Factual Background

The following facts are drawn from the Complaint.[1]  For purposes of this motion, the

Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable

inferences therefrom in the pleader's favor."  Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th

593, 598 (1st Cir. 2024) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 162 (1st Cir.

2020)).

---

[1] The Court does not base its decision on the body-worn footage attached to Payne's motion to dismiss, [ECF Nos. 15-1, 15-2, 23], consideration of which is unnecessary to resolve the motions before the Court.  The Court also denies Khudaynazar's motion for reconsideration, [ECF No. 26], of the Court's order granting Payne's motion to file that footage under seal, [ECF No. 22]. Contrary to Khudaynazar's arguments, the basis for this Court's order—that is, a concern for protecting victims of domestic violence, including a non-party to this case—could be "inferred from the substance of the parties' motions," United States v. Kravetz, 706 F.3d 47, 60 (1st Cir. 2013), and that concern provides an "overriding interest in sealing" that outweighs the presumption of public access for documents submitted in support of dispositive motions, Bradford & Bigelow, Inc. v. Richardson, 109 F. Supp. 3d 445, 449 (D. Mass. 2015).  The Court also notes that Khudaynazar appears to have access to the footage in question, see [ECF No. 28-1]; [ECF No. 29 at 4]; cf. Mass. Gen. Laws ch. 41, § 97D (2014) (requiring reports of domestic violence to be "accessible at all reasonable times, upon written request" to "the victim, the victim's attorney, and others specifically authorized by the victim to obtain such information"), making it unclear why she requires a court order to make it public or have it available to tell her side of the story, should she wish to do so, see [ECF No. 28 at 5–6].  Because Khudayanazar has not persuaded the Court that its decision to seal the footage was "clearly erroneous" or "would work a manifest injustice," Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 n.8 (1983)), her motion for reconsideration is **DENIED**.  That said, the Court notes that Mass. Gen. Laws ch. 41, § 97D, the statute that Payne invokes as a justification for sealing, does not categorically prohibit disclosure of police reports of domestic violence in a civil action pursuant to a court order.  See Commonwealth v. George W. Prescott Publ'g Co., LLC, 973 N.E.2d 667, 676 (Mass. 2012); Roman Cath. Bishop of Springfield v. Travelers Cas. & Sur. Co., No. 050602, 2008 WL 650392, at *2 (Mass. Super. Ct. Jan. 7, 2008).  Accordingly, although the Court declines to unseal the footage at this time, Khudaynazar may renew her request to unseal the footage, or to unseal it with appropriate redactions, as this litigation progresses.

In May 2022, Khudaynazar, who "presents as and is a non-[w]hite immigrant," [Compl. ¶ 23], began working for the City as an executive assistant in the Office of Neighborhood Services. [Id. ¶ 7]. It was her second job out of college. [Id.]. On October 2, 2024, she was offered, and subsequently accepted, the role of Chief of Staff in the City's Office of Police Accountability and Transparency ("OPAT"), which investigates complaints of Boston Police Department misconduct. [Id. ¶ 8]; see also Police Accountability and Transparency, City of Boston, https://www.boston.gov/departments/police-accountability-and-transparency (last visited February 3, 2025). "Her role was administrative" and she "had no discretionary authority over investigations." [Compl. ¶ 8].

Khudaynazar, who had longstanding hip problems, took medical leave to have hip replacement surgery, from April 22, 2025, the date of her surgery, until June 18, 2025. [Compl. ¶¶ 9–11]. Her supervisor approved her medical leave. [Id. ¶ 10]. Andrea Hennelly, a "human resources officer" for the City, told Khudaynazar that she had to use her sick time before she could take leave under the Family and Medical Leave Act ("FMLA"), so Khudaynazar had an assistant enter her sick time until it was exhausted. [Id.]. Following her surgery, Khudaynazar spent a week in bed and two weeks on crutches; she walked with a limp until around the end of May 2025. [Id. ¶ 11].

On May 14, 2025, Khudaynazar went to a bar to watch a Celtics game with a friend. [Compl. ¶ 12]. Her friend was half an hour late, but, at the bar, she met Segun Idowu ("Idowu"), the City's Chief of Economic Opportunity and Inclusion. [Id. ¶¶ 13–14]. Idowu was appointed by Wu "and important to W[u] in securing many Black business owners' votes in the upcoming [November 2025] Boston mayoral election." [Id. ¶ 13]. Idowu is "about ten years older" than Khudaynazar, [id.], who is "in her 20s," [id. ¶ 22], and her then-boyfriend, Chulan Huang

("Huang"), worked for Idowu's office, [id. ¶ 13]. Idowu invited Khudaynazar to sit with him and bought her a drink. [Id. ¶ 14]. "They chatted about work." [Id.]. When Khudaynazar's friend arrived, the three of them "chatted briefly" and then Khudaynazar and her friend "conversed separately." [Id.]. After her friend left, Idowu and Khudaynazar "spoke alone at the bar." [Id. ¶ 15]. Idowu then allegedly "made sexual advances" and touched her lower back. [Id.]. He showed her on his phone that he had made a reservation at the Boston Park Plaza hotel and invited her to join him there, but she declined. [Id.]. Idowu walked her to her car and kissed her. [Id.]. He then got into her car and she drove him to his hotel, where she left him. [Id.].

After dropping off Idowu, Khudaynazar drove to her boyfriend's apartment and told him what had happened. [Compl. ¶ 16]. The Complaint does not explain in detail what happened next, but Huang eventually "took [her] phone and car and texted . . . Idowu," [id. ¶ 17], and Khudaynazar called the police, [id. ¶ 18]. Huang returned and then two Boston Police Department officers arrived at the apartment: Payne, who is white, [id. ¶ 23], and Cris Santana ("Santana"). [Id. ¶ 19]. Khudaynazar told the officers that Huang "was upset because she 'went on a date' with his boss and was holding on to her wrists and wouldn't let her go," but that she did not want to press charges. [Id. ¶ 20]. When it became clear that the police would arrest Huang, Khudaynazar asked Santana to come into the apartment to speak with her outside the presence of Huang, who was outside with Payne. [Id. ¶ 21]. She told Santana "that they both work for the City, the Mayor's office, and so they know it's not a joke, and that she knows this does not need to escalate, and pleaded with [Santana] not to escalate the situation by arresting . . . Huang." [Id.]. Santana eventually told Huang to "come in and grab his shirt so he could be arrested and taken to the station." [Id.]. When Khudaynazar asked to speak to a supervisor, Payne "immediately and without checking[] told [her] that the supervisor was too

busy." [Id.].  Khudaynazar told Payne that she knew she was allowed to ask for a supervisor.
[Id.].

Payne arrested Huang and took him outside again, but Khudaynazar and Santana
remained in the apartment.  [Compl. ¶ 23].  Santana then "pulled K[hudaynazar's] arm to
exit . . . Huang's apartment out the front door."  [Id.].  Once outside, Santana told Payne—
falsely, according to the Complaint, [id. ¶ 26]—that Khudaynazar had hit her when she tried to
leave the apartment.  [Id. ¶ 23].  Khudaynazar came out of the apartment, denying that she had
hit Santana, and Santana "implied that she would not be arrested but would get a summons
addressed to . . . Huang's apartment."  [Id.].  When Khudaynazar repeated her request to speak
with a supervisor, Payne responded, "you're not getting a sergeant . . . because he's busy," and
asked her, "am I speaking English?"  [Id.].  Khudaynazar said to Payne, "you don't have to be a
dick to me," "to which P[ayne] responded by immediately arresting K[hudaynazar], claiming he
was doing so for K[hudaynazar] hitting . . . Santana."  [Id.].  Khudaynazar was booked that
night, in "the early morning hours of May 15, 2025."  [Id. ¶ 27].

Later that same day, on May 15, 2025, the media published the police report of the
encounter online.  [Compl. ¶ 28].  Khudaynazar's and Huang's names were not redacted, and the
report mentioned that Khudaynazar had said that she had gone on a date with Idowu, [id. ¶¶ 28–
29]; the police report also reported that Khudaynazar had told the police that "we both work for
the city of Boston, we both work for the Mayors Office," [id. ¶ 46].  The news "created a media
and political frenzy."  [Id. ¶ 28].  Wu commented to NBC Boston that "[t]he allegations are
incredibly disturbing" and that "[i]t is never OK to harm a police officer or to harm another

member of our community."[2]  [Id. ¶ 30]; Eli Rosenberg, 2 Boston Employees Arrested on

Domestic Violence Charges, NBC Boston (May 15, 2025),

https://www.nbcboston.com/news/local/2-boston-employees-arrested-on-domestic-violence-

charges/3715193/.

 That same day, the City suspended Khudaynazar without pay and "without asking her

what happened."  [Compl. ¶ 29]; [ECF No. 1-3 at 27 (May 15, 2025, notice of unpaid

administrative leave)].  According to the Complaint, this was contrary to the City's usual practice

of placing employees on paid leave until it could gather more information.  [Compl. ¶ 29]; see

also [id. ¶¶ 58–64 (discussing cases of other employees and the City's "policy and/or practice")].

On Saturday, May 17, 2025, the City sent Khudaynazar a notice of an investigatory interview

that it had scheduled for the afternoon of the following Monday, May 19, 2025.  [Compl. ¶ 32];

[ECF No. 1-3 at 29 (May 17, 2025, notice of investigatory interview)].  Khudaynazar asked for

time to hire an attorney, and the City moved the interview to Tuesday, May 20, 2025.  [Compl.

¶ 33].  On May 19, 2025, at 5:04pm, the evening before the interview, the City sent her a

"Carney Form,"[3] which stated, among other things, that, if she chose to invoke her rights against

self-incrimination, the City would "determine appropriate next steps up to and including

termination . . . without [her] input."  [Id. ¶ 34]; [ECF No. 1-3 at 32].  Khudaynazar signed the

---

[2] The Complaint quotes only the second part of Wu's statement to NBC Boston, but it links to
the NBC Boston article, which the Court considers as incorporated by reference.  See, e.g.,
Piercy v. AT&T Inc., No. 24-cv-10608, 2025 WL 2505660, at *32 n.21 (D. Mass. Aug. 29,
2025), report and recommendation adopted, No. 24-cv-10608, 2025 WL 2809008 (D. Mass.
Sept. 30, 2025).

[3] In Carney v. City of Springfield, the Massachusetts Supreme Judicial Court held that public
employees may be compelled under threat of discharge to answer questions reasonably related to
their job performance only if they are granted transactional immunity.  532 N.E.2d 631, 635–36
(Mass. 1988).

form "without an attorney," writing on it that she was "choosing to speak" but "doing so under duress" because she was "informed that if [she] d[id] not attend the interview at the scheduled time, [she] w[ould] lose the opportunity to provide input."[4]  [Compl. ¶ 35]; [ECF No. 1-3 at 34].

On May 19, 2025, Khudaynazar also received a call from Sharon Stout, the Chair of the Board of Directors of Emerge Massachusetts, a political leadership program "for Democratic women who want to run for office."  [Compl. ¶ 49].  Khudaynazar had participated in Emerge's program and "was slated to graduate after one more class," [id. ¶ 52], but Stout told her that the Board had "decided to remove [her] and not allow her to graduate," [id. ¶ 53].  The Complaint alleges, "[u]pon information and belief," that Wu—herself "a powerful alumna of Emerge," [id. ¶ 50]—and the City "intentionally caused" her expulsion "to punish and deplatform her and quiet any story about . . . Idowu."  [Id. ¶ 55].  Khudaynazar "does not have direct knowledge" of any interaction by Wu and the City with Emerge, but she claims that "Emerge would not have removed [her] without W[u] and the C[ity]'s blessing."  [Id.].

On May 20, 2025, at the City's investigatory interview, Khudaynazar "was not given an opportunity to give her version of the May 15, 2025 events at issue."  [Compl. ¶ 36].  Hennelly told her that she was being investigated "for telling colleagues that she was out on FMLA leave when really it was sick leave."  [Id.].  Khudaynazar responded that "it was . . . Hennelly [who] told her she had to exhaust her sick leave before taking FMLA leave."  [Id.].

"News of K[hudaynazar's] firing hit moments after the interview's conclusion."  [Compl. ¶ 37].  A City spokesperson issued the following public statement:  "After completing an internal

---

[4] The Complaint alleges that Khudaynazar signed the form on May 20, 2025, but the date next to her signature on the form is May 19, 2025.  Contrast [Compl. ¶ 35], with [ECF No. 1-3 at 34].

review, the employment of both [Khudaynazar] and [Huang] has been terminated by the City. The review found no violations of law or City workforce policies by any other City employees." [Id. ¶ 75]; Saraya Wintersmith, <u>Boston Fires Two Staffers Arrested in Apparent Domestic Disturbance</u>, WGBH (May 20, 2025), https://www.wgbh.org/news/politics/2025-05-20/boston-fires-two-staffers-arrested-in-apparent-domestic-disturbance.  A termination letter, which Khudaynazar alleges was drafted before the interview took place, was served on Khudaynazar by a constable later that day.  [Compl. ¶ 37]; <u>see also</u> [ECF No. 1-3 at 36–38 (termination letter and notice of service)].  The letter noted that although "[a]t [Khudaynazar's] request," the City "did not ask [her] any questions about the May 15, 2025 incident," the City "believe[d]" that Khudaynazar had told police that she and Huang worked for the City and the Mayor's Office, as had been publicly reported, and it "interprete[d]" that statement "as an improper attempt to invoke [her] position for favorable treatment."  [ECF No. 1-3 at 36].  The letter further expressed "concerns regarding [her] ability to fulfill [her] responsibilities as the HR representative for OPAT" because she had "communicated to Department staff that [she] w[as] taking leave through the [FMLA]," but had "never applied for, or received formal approval of, any request for medical leave."  [Id.].  Based on these issues, the letter stated that Khudaynazar's employment was terminated "effective immediately."  [Id.].  The letter did not mention Khudaynazar's alleged assault and battery on Payne as a reason for her termination.  [Compl. ¶¶ 41–42].

Three weeks later, on June 9, 2025, the Boston Globe published an article based on an interview with Khudaynazar, which stated that "Khudaynazar believes she was fired quickly to insulate the mayor's most prominent Cabinet chief, Segun Idowu, who was her boyfriend's boss."  [Compl. ¶ 56]; Andrew Ryan, <u>Former Boston City Hall Staffer Claims Wu Administration Fired Her to Protect Top Aide</u>, Boston Globe (June 9, 2025),

https://www.bostonglobe.com/2025/06/09/metro/mayor-wu-employee-fired-domestic-violence-arrest/.  In response to the article, Stout, the Chair of Emerge, texted Khudaynazar, telling her to "[s]top speaking to press," a "directive" that, the Complaint alleges, "[o]n information and belief," came from Wu and the City.  [Compl. ¶ 57].  On June 17, 2025, speaking on WGBH's Boston Public Radio, Wu "doubled down on the recent dismissal" of Khudaynazar and Huang, "maintain[ing] that the two employees were fired due to their alleged attempt to avoid consequences with police by mentioning their employment with the city."  [Id. ¶ 76]; Saraya Wintersmith, Wu Says Kraft's $172 Million White Stadium Figure 'Not the Real Cost,' WGBH (June 17, 2025), https://www.wgbh.org/news/politics/2025-06-17/wu-says-krafts-172-million-white-stadium-figure-not-the-real-cost.

On June 14, 2025, Khudaynazar submitted a public-records request to the City pertaining to her termination.  [Compl. ¶ 77]; see also [ECF No. 1-3 at 42–43 (June 14, 2025, public-records request)].  When the City did not provide a timely response, she appealed to the state Supervisor of Records, who ordered the City to respond.  [Compl. ¶¶ 78–79]; [ECF No. 1-3 at 40–41 (August 8, 2025, appeal to Supervisor of Records)]; [ECF No. 1-3 at 56–58 (August 15, 2025, order of Supervisor of Records)].  On July 3, 2025, Khudaynazar submitted a second public-records request regarding the City's policies and practices for employee discipline.  [Compl. ¶ 77]; see also [ECF No. 1-3 at 50–51 (July 3, 2025, public-records request)].  The City did not timely respond, and Khudaynazar again appealed to the Supervisor of Records, who again ordered the City to respond.  [Compl. ¶¶ 78–79]; [ECF No. 1-3 at 48–49 (August 12, 2025, appeal to Supervisor of Records)]; [ECF No. 1-3 at 60–62 (August 21, 2025, order of Supervisor of Records)].  The City allegedly had not "provide[d] a substantive response" to Khudaynazar's requests by September 16, 2025.  [Compl. ¶ 80]; see also [Compl. at 25].

Khudaynazar alleges that the "actions of Defendants and their agents . . . wrecked [her] life . . . financially, emotionally, and physically." [Compl. ¶ 81].

### B.    Procedural History

Khudaynazar commenced this action in Massachusetts state court on September 17, 2025, filing with her Complaint a motion for preliminary injunctive relief. [ECF No. 8 at 1–3 (state court docket)]; [Compl.]; [ECF No. 8 at 68–69 (motion for preliminary injunctive relief)]. The state court scheduled a hearing on the motion for September 25, 2025, [ECF No. 8 at 4], but, on September 22, 2025, before that hearing could take place, the defendants removed the action to federal court based on federal-question jurisdiction, [ECF No. 1].

On September 24, 2025, Khudaynazar renewed her motion for a preliminary injunction, seeking to compel the City to respond to her public-records request. [ECF No. 6]. The City did not respond to the motion, but, after prompting by the Court, [ECF No. 33], the parties filed a status report confirming that the City had fully responded to the Khudaynazar's public-records request, [ECF No. 34], mooting the motion, [ECF No. 36]. On November 6, 2025, Payne, [ECF No. 14], the City, [ECF No. 17], and Wu, [ECF No. 19], moved to dismiss all counts of the complaint for failure to state a claim. On December 1, 2025, Khudaynazar opposed the motions to dismiss, [ECF No. 30], and, on January 9, 2026, Payne, the City, and Wu replied, [ECF No. 37].

## II.    LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded facts as true, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not

required, but the complaint must set forth "more than labels and conclusions," <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," <u>Gagliardi v. Sullivan</u>, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations omitted) (quoting <u>Centro Médico del Turabo, Inc. v. Feliciano de Melecio</u>, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  <u>Twombly</u>, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  <u>Grajales v. P.R. Ports Auth.</u>, 682 F.3d 40, 44–45 (1st Cir. 2012) (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  <u>Id.</u> at 44 (quoting <u>Iqbal</u>, 556 U.S. at 679).

## III.    DISCUSSION

In her Complaint, Khudaynazar asserts ten claims against the defendants: a retaliatory-arrest claim against Payne (Count 1); a § 1983 due-process claim against the City (Count 2); a § 1983 retaliatory-discharge claim against the City (Count 3); a § 1983 equal-protection claim against the City (Count 4); a tortious-interference claim against the City and Wu (Count 5); an invasion-of-privacy claim against the City and Wu (Count 6); a defamation claim against the City and Wu (Count 7); a claim for retaliation in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 150, against the City (Count 8); and a claim for retaliation in violation of

the Massachusetts employment-discrimination statute, Mass. Gen. Laws ch. 151B, § 5, against

the City (Count 9).[5]  The Court discusses the claims against each defendant in turn.

### A.    Claim Against Payne (Count 1)

Khudaynazar alleges that Payne arrested her in retaliation for her telling him that he "[did

not] have to be a 'dick' to her."  [Compl. ¶ 83].  Payne argues that Khudaynazar's retaliatory-

arrest claim fails because she has not plausibly alleged that he lacked probable cause to arrest her

for assaulting Santana.  [ECF No. 15 at 4–6].  Khudaynazar concedes that Payne had probable

cause to arrest her based on Santana's statement that Khudaynazar had assaulted her.  [ECF No.

30 at 9].  She argues, however, that her claim should proceed because the officers initially

exercised their discretion not to arrest her, but then changed course and arrested her after she

engaged in protected speech.  [Id.].

The First Amendment to the U.S. Constitution protects "the freedom of speech."[6]  U.S.

Const. amend. I.  Retaliation "is not expressly referred to in the Constitution," but it "is

nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of

constitutional rights."  Powell v. Alexander, 391 F.3d 1, 16–17 (1st Cir. 2004) (quoting ACLU of

Md., Inc. v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993)).  A plaintiff pressing a

retaliatory-arrest claim based on speech protected by the First Amendment generally "must plead

and prove the absence of probable cause for arrest."  Nieves v. Bartlett, 587 U.S. 391, 402

---

[5] The Complaint also contained a claim for violation of the Massachusetts public records law, Mass. Gen. Laws ch. 66, § 10 (Count 10), which was dismissed by stipulation of the parties based on the City's compliance with Khudaynazar's public-records requests.  [ECF Nos. 34, 39].
[6] The First Amendment applies to state and municipal actors through the Due Process Clause of the Fourteenth Amendment.  Gitlow v. New York, 268 U.S. 652 (1925); De Jonge v. Oregon, 299 U.S. 353, 364 (1937).

(2019).  The probable-cause inquiry is conducted "under objective standards of reasonableness." Id. at 403.  Courts ask "whether the circumstances, viewed objectively, justify [the challenged] action," disregarding entirely "the subjective intent motivating the relevant officials."  Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011)).  Although the existence of probable cause thus generally defeats a plaintiff's retaliatory-arrest claim, the Supreme Court recognized a "narrow exception" to this rule in Nieves, holding that "[t]he existence of probable cause does not defeat a plaintiff's claim if [s]he produces 'objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'"  Gonzalez v. Trevino, 602 U.S. 653, 655 (2024) (per curiam) (quoting Nieves, 587 U.S. at 407).  This exception exists to guard against the "risk that some police officers may exploit the arrest power as a means of suppressing speech."  Nieves, 587 U.S. at 406 (quoting Lozman v. Riviera Beach, 585 U.S. 87, 99 (2018)).  Because the application of the Nieves exception turns on objective evidence, "the statements and motivations of the particular arresting officer are," again, "irrelevant."  Id. at 407 (quoting Devenpeck v. Alford, 543 U.S. 146, 153 (2004)).

Here, Khudaynazar's retaliatory-arrest claim fails because it does not fall within this narrow exception.  Simply put, the Complaint contains no allegations, let alone "objective evidence," id., that assaults on police officers, like her alleged assault on Santana, rarely result in arrests.  To be sure, plaintiffs in Khudaynazar's position are not required to "provide very specific comparator evidence" or "virtually identical and identifiable comparators."  Gonzalez, 602 U.S. at 658.  They must, however, provide evidence about officers' treatment of "similarly situated individuals," Nieves, 587 U.S. at 407, or, at the very least, evidence that "no one has ever been arrested for engaging in a certain kind of conduct[,] especially when the criminal prohibition is longstanding and the conduct at issue is not novel," Gonzalez, 602 U.S. at 658; see

13

<u>also</u> <u>id.</u> at 668 (Alito, J., concurring) (contrasting "affirmative evidence that the defendant let other individuals off the hook for comparable behavior" with "negative evidence," such as "the lack of similar arrests").  In <u>Nieves</u>, the Supreme Court gave the example of "jaywalking," which, "at many intersections . . . is endemic but rarely results in arrests."  587 U.S. at 407.  And in <u>Gonzalez</u>, the Supreme Court remanded for the lower courts to evaluate evidence based on "the past decade's misdemeanor and felony data," which allegedly showed that the statute in question had never been used in the county in a similar case.  602 U.S. at 657, 659.  Because Khudaynazar has provided no evidence tending to show that "an officer has declined to arrest someone for engaging in [similar] conduct in the past," <u>id.</u> at 658 (emphasis omitted), she cannot avail herself of the <u>Nieves</u> exception.  And because she concedes that Payne had probable cause to arrest her, her retaliatory-arrest claim fails.

Khudaynazar's argument that the exception should apply because Payne only arrested her after she engaged in protected speech reflects a misunderstanding of the law.  The point of <u>Nieves</u>'s no-probable-cause rule is precisely to mitigate the difficulties inherent in "determin[ing] whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct."  <u>Nieves</u>, 587 U.S. at 402.  And <u>Nieves</u>'s exception is a narrow one, open only to plaintiffs who can establish, through objective evidence, that "non-retaliatory grounds [we]re in fact insufficient to provoke the adverse consequences."  <u>Id.</u> at 407 (quoting <u>Hartman v. Moore</u>, 547 U.S. 250, 256 (2006)).  Allowing a plaintiff to meet this showing with evidence of the defendant's actions in her own case alone would collapse the threshold inquiry under <u>Nieves</u>—which is designed to ferret out instances of selective enforcement—with the merits of the retaliation claim, which require proof that the plaintiff's "protected conduct played a 'substantial or motivating' part in the adverse action."  <u>Berge v. Sch.</u>

14

Comm. of Gloucester, 107 F.4th 33, 37 n.4 (1st Cir. 2024) (quoting Gattineri v. Town of

Lynnfield, 58 F.4th 512, 514 (1st Cir. 2023)); accord Gonzalez, 602 U.S. at 667 (Alito, J.,

concurring) ("[E]vidence that tends to show only that the plaintiff's constitutionally protected

speech was a 'substantial or motivating factor' behind the adverse action should not be

considered unless and until the plaintiff can provide other evidence to satisfy the Nieves

exception.").  Moreover, the application of the Nieves exception, unlike the underlying causation

inquiry, turns on objective evidence regarding "circumstances where officers have probable

cause to make arrests, but typically exercise their discretion not to do so."  Nieves, 587 U.S. at

406–07 (emphasis added).  Khudaynazar's insistence that "the actual person who allegedly

committed the offense . . . was not arrested absent her protected speech," [ECF No. 30 at 9], is

thus beside the point.  Payne's motion to dismiss Khudaynazar's retaliatory-arrest claim is

**GRANTED**.

### B.    Claims Against the City[7]

### 1.    Due Process (Count 2)

Khudaynazar alleges that her "termination under false pretenses and/or without process

and/or by sham process" violated her due-process rights.  [Compl. ¶ 85].  The City argues that

she did not have a property interest in her continued employment and that, if even she did have

such an interest, she received all the process she was due.  [ECF No. 18 at 6–8].  Khudaynazar

responds that her due-process claim "is not premised on a 'property' right, but on her right to

---

[7] The Complaint asserts Counts 5, 6, and 7 against both the City and Wu, but, in her motion-to-dismiss opposition, Khudaynazar assents to the dismissal of these counts as against the City. [ECF No. 30 at 16].  Accordingly, the City's motion to dismiss Counts 5, 6, and 7 is **GRANTED**.

'liberty,' to be free from a defamatory termination," arguing that she has plausibly alleged a "stigma-plus" due-process claim.  [ECF No. 30 at 12].

The Fourteenth Amendment's Due Process Clause mandates that no state "shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  As relevant here, "[t]he right to procedural due process 'guarantee[s] . . . that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner.'"  Maldonado-González v. P.R. Aqueduct & Sewer Auth., 158 F.4th 27, 34 (1st Cir. 2025) (quoting Gonzáles-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011)).  "To state a valid procedural due process claim, a plaintiff must (1) identify a protected liberty or property interest, and (2) allege that the defendants . . . deprived [her] of that interest without constitutionally adequate process."  Air Sunshine, Inc. v. Carl, 663 F.3d 27, 34 (1st Cir. 2011).

In the public-sector employment context, the Due Process Clause requires that, when an employer "creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge," the employee be provided "with an opportunity to dispute the defamatory allegations."  Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 103 (1st Cir. 2002).  Doctrinally speaking, "a deprivation of a constitutionally protected liberty interest [occurs] when, in addition to mere reputational injury, words spoken by a government actor adversely impact a right or status previously enjoyed under state law."  Pendleton v. City of Haverhill, 156 F.3d 57, 63 (1st Cir. 1998).  Claims founded on such a deprivation of liberty are known as "stigma plus" claims because they require plaintiffs to prove both "stigmatization at the hands of a government actor" and "an adverse effect on some interest 'more tangible' than

reputational harm."  URI Student Senate v. Town of Narragansett, 631 F.3d 1, 9 (1st Cir. 2011)

(quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).  To prevail on a stigma plus claim against a

public employer, a plaintiff must satisfy a "five-part test":

> [1] The challenged statements must be false, [2] they must have seriously
> damaged the employee's reputation and standing in the community, [3] they must
> have been intentionally publicized by the government employer, [4] they must
> have been made in conjunction with the employee's termination, and [5] the
> government must have denied the employee's post-termination request for a
> name-clearing hearing.

Kando v. Rhode Island State Bd. of Elections, 880 F.3d 53, 62 (1st Cir. 2018).

Here, Khudaynazar characterizes her due-process claim as a stigma plus claim, but she

does not allege that she ever asked for a post-termination name-clearing hearing, which is fatal to

such a claim.  Buntin v. City of Boston, 813 F.3d 401, 407 (1st Cir. 2015).[8]  Instead,

Khudaynazar's due-process arguments focus on the adequacy of the City's pretermination

investigatory interview, which she asks this Court to evaluate under Cleveland Board of

Education v. Loudermill, 470 U.S. 532 (1985), and its progeny.  [ECF No. 30 at 12–14].

Loudermill, however, provides the framework for due-process claims based on deprivations of

protected property interests, not claims based on deprivations of protected liberty interests.  See,

e.g., Moore v. City of Cleveland, 812 F. App'x 299, 305 (6th Cir. 2020) (distinguishing cases

---

[8] Even if Khudaynazar's objection to the City's planned investigatory interview could be
construed as a request for a name-clearing hearing, her stigma plus claim would fail because she
has not plausibly alleged that the City's (or Wu's) statements were false.  The only public
statements by the City and Wu are manifestly non-defamatory.  [Compl. ¶¶ 30 (Wu stating that
"[i]t is never OK to harm a police officer or to harm another member of our community"); 75
("After completing an internal review, the employment of [Khudaynazar] has been terminated by
the City."); 76 ("Wu maintained that the two employees were fired due to their alleged attempt to
avoid consequences with police by mentioning their employment with the City." (emphasis
added))].

involving property interests analyzed under <u>Loudermill</u> from cases involving stigma-plus claims premised on a liberty interest).  Because Khudaynazar does not argue that she has a property interest in her continued employment by the City, she is entitled, at most, to an opportunity to clear her name, not to a pretermination hearing that complies with <u>Loudermill</u>.[9]  <u>Wojcik</u>, 300 F.3d at 101–03; <u>see also</u> <u>Anemone v. Metro. Transp. Auth.</u>, 629 F.3d 97, 121 (2d Cir. 2011) ("In the context of an at-will government employee, a reasonably prompt, post-termination name-clearing hearing satisfies constitutional due process as long as the procedures afforded at such a hearing are sufficient to protect the employee's reputational and professional interests." (quoting <u>Segal v. City of New York</u>, 459 F.3d 207, 218 (2d Cir. 2006))); <u>Eklund v. City of Seattle Mun. Ct.</u>, 628 F.3d 473, 484 n.1 (9th Cir. 2010) (noting that at-will employees are "entitled only to a name-clearing hearing, not to a pretermination hearing concerning the discharge itself").  Thus, the City's motion to dismiss Khudaynazar's due-process claim is **<u>GRANTED</u>**.

### 2.    First Amendment Retaliation (Count 3)

Khudaynazar alleges that the City suspended her without pay and then fired her in retaliation for "mak[ing] reports to the police" and "mak[ing] public statements on matters of public concern," including her statements that she "works for the C[ity]" and "went on a date" with Idowu.  [Compl. ¶ 87].  The City argues that this claim should be dismissed because Khudaynazar's alleged statements were not statements on matters of public concern and that, in any case, the City's interest in protecting the credibility of OPAT outweighs Khudaynazar's

---

[9] Thus, the Court need not resolve whether the pretermination process that Khudaynazar received was sufficient under <u>Loudermill</u>.  <u>See</u> [ECF No. 18 at 7–8]; [ECF No. 30 at 12–13].

alleged interest in publicizing the "off-duty interpersonal relationships of employees." [ECF No. 18 at 9–10].

To succeed on a First Amendment retaliation claim, a public employee must establish that (1) she "spoke as a citizen on a matter of public concern," (2) "the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently," an assessment commonly referred to as the <u>Pickering</u> balancing test, and (3) "the protected speech was a 'substantial or motivating factor in the adverse employment decision.'" <u>Hussey v. City of Cambridge</u>, 149 F.4th 57, 65–66 (1st Cir. 2025) (first quoting <u>Gilbert v. City of Chicopee</u>, 915 F.3d 74, 82 (1st Cir. 2019); then quoting <u>Mihos v. Swift</u>, 358 F.3d 91, 102 (1st Cir. 2004); and then quoting <u>Ciarametaro v. City of Gloucester</u>, 87 F.4th 83, 88 (1st Cir. 2023)); <u>accord</u> <u>Pickering v. Bd. of Ed.</u>, 391 U.S. 563 (1968). If the employee makes "a prima facie showing to this effect, the burden shifts to the defendants to demonstrate that they would have taken the same action regardless of [the employee's] speech." <u>Alston v. Town of Brookline</u>, 997 F.3d 23, 42 (1st Cir. 2021). A plaintiff is not required to plead facts establishing a prima facie case to survive a motion to dismiss, but the elements of that case "may be used as a prism to shed light upon the plausibility of the claim." <u>Rodríguez-Reyes v. Molina-Rodríguez</u>, 711 F.3d 49, 54 (1st Cir. 2013); <u>see also</u> <u>Educadores Puertorriqueños en Acción v. Hernández</u>, 367 F.3d 61, 66 n.1 (1st Cir. 2004) (noting applicability of this rule "to all civil rights actions").

Here, the Court finds that Khudaynazar has plausibly alleged that she spoke as a citizen on a matter of public concern. The City does not dispute that she made the statements at issue as a citizen rather than pursuant to her official duties. [ECF No. 18 at 9]; <u>see also</u> <u>Hussey</u>, 149 F.4th at 65. "Whether an employee's speech involves a 'matter of public concern' is a case-specific, fact-dependent inquiry." <u>Curran v. Cousins</u>, 509 F.3d 36, 46 (1st Cir. 2007). The Court

considers "the content, form, and context of a given statement, as revealed by the whole record." Rosado-Quiñones v. Toledo, 528 F.3d 1, 5 (1st Cir. 2008) (quoting Connick v. Myers, 461 U.S. 138, 147–48 (1983)). "Speech involves matters of public concern 'when it can "be fairly considered as relating to any matter of political, social or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."'" Lane v. Franks, 573 U.S. 228, 241 (2014) (quoting Snyder v. Phelps, 562 U.S. 443, 453 (2011)). The "quintessential subjects of public concern when it comes to public employee speech" are "official malfeasance, abuse of office, and neglect of duties." Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 36 (1st Cir. 2020) (quoting Rosado-Quiñones, 528 F.3d at 5).

Here, although the issue is close, Khudaynazar's statements to the police about a potentially inappropriate workplace relationship she had with a high-ranking City official plausibly amounts to protected citizen speech on a matter of public concern. See, e.g., Roy v. Correct Care Sols., LLC, 914 F.3d 52, 73 (1st Cir. 2019) ("Complaints . . . made to supervisors and public officials about sexual harassment and safety at public agencies can be protected citizen speech on matters of public concern."); Thomas v. Town of Salisbury, 134 F. Supp. 3d 633, 643 (D. Mass. 2015) (holding that speech about sexual harassment of female employees by acting chief of police was on a subject of public concern). The context and form of Khudaynazar's speech, which, according to the Complaint, was designed to explain to the police the reason for her fight with her boyfriend, [Compl. ¶ 20], arguably cut against her assertion that she was engaged in First Amendment–protected speech. See Roy, 914 F.3d at 73 ("[A]lthough the Supreme Court has established that form is never 'dispositive' of the public concern question . . . it has sometimes seen a plaintiff's failure 'to inform the public' about her concerns

as cutting against First Amendment protection." (first quoting <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 420 (2006); and then quoting <u>Connick</u>, 461 U.S. at 148)).  Nevertheless, the City suspended and terminated Khudaynazar only after her speech, which was included in the arrest report, became public.  [Compl. ¶¶ 28, 29, 37].  Based on the record before it, the Court finds that Khudaynazar has plausibly, albeit thinly, alleged that her statements about her interaction with Idowu qualify as citizen speech on a matter of public concern.  <u>Cf.</u> <u>Decotiis v. Whittemore</u>, 635 F.3d 22, 34–35 (1st Cir. 2011) ("[W]hile we cannot conclusively say that Plaintiff's speech was made as a citizen . . . it is sufficient that the complaints alleges facts that plausibly set forth citizen speech.").

Nor is the Court willing, at this stage in the litigation, to dismiss Khudaynazar's retaliation claim based on a <u>Pickering</u> balancing analysis.  Under <u>Pickering</u>, the Court considers "(1) 'the time, place, and manner of the employee's speech,' and (2) 'the employer's motivation in making the adverse employment decision.'"  <u>Bruce v. Worcester Reg'l Transit Auth.</u>, 34 F.4th 129, 138 (1st Cir. 2022) (quoting <u>Decotiis</u>, 635 F.3d at 35).  "The <u>Pickering</u> balancing inquiry is a question of law for the court, but 'it is also a "fact-intensive" inquiry,'" <u>Hussey</u>, 149 F.4th at 66 (quoting <u>MacRae v. Mattos</u>, 106 F.4th 122, 136 (1st Cir. 2024)), meaning that it does not easily lend itself to resolution on a motion to dismiss, <u>Decotiis</u>, 635 F.3d at 35 n.15; <u>see also</u> <u>Dusenberry v. Massachusetts</u>, 676 F. Supp. 3d 50, 52 (D. Mass. 2023) ("[A] Rule 12(b)(6) motion is generally not the proper vehicle to perform the balancing required under <u>Pickering</u>." (quoting <u>Hayes v. IXP Corp.</u>, No. 19-cv-12042, 2020 WL 30424, at *1 (D. Mass. Jan. 2, 2020))).

Here, the City argues that its interest in protecting the credibility of OPAT by terminating employees who attempt to use their position to obtain favorable treatment by the police outweighs the First Amendment interests of Khudaynazar and the public in speech about "off-

duty interpersonal relationships of employees."  [ECF No. 18 at 9–10].  Khudaynazar counters

that she was "fired for disclosing the philandering of . . . Idowu" and that it is this speech that

must be balanced against the City's interests; she also contends that the City does not have a

legitimate interest in "covering up sexual improprieties."  [ECF No. 30 at 15].

On the record before it, the Court cannot resolve this issue in the City's favor.  The time

place, and manner of Khudaynazar's speech about Idowu suggests that her First Amendment

interest may be slight, in that her speech appears to have been "motivated by self-interest rather

than by a desire to serve the public interest."  Jordan v. Carter, 428 F.3d 67, 74 (1st Cir. 2005).

As discussed supra, however, her speech was later disseminated to a wider audience, and

arguably touched on a topic of public concern—that is, the conduct of a high-ranking City

official; it also took place in the run-up to an election.  With respect to the City's motivation for

suspending and firing Khudaynazar, the Complaint alleges, albeit in somewhat conclusory

fashion, that the City was retaliating against Khudaynazar and attempting to cover up Idowu's

conduct, rather than protecting the credibility and functioning of OPAT.  [Compl. ¶¶ 29, 67, 69];

see also Decotiis, 635 F.3d at 36 (denying motion to dismiss where based on "the complaint's

well-pleaded facts . . . , the sole motivation behind the [adverse action] was retaliation, not the

furtherance of governmental interests").  The City disagrees with Khudaynazar's characterization

of its motives, [ECF No. 18 at 9–10], but, at this stage in the proceedings, the factual record is

not sufficiently developed for the Court to conduct a full Pickering analysis, and the Court

declines to dismiss Khudaynazar's retaliation claim on this ground.  Accordingly, the City's motion to dismiss Khudaynazar's retaliation claim is **DENIED**.[10]

### 3.      Equal Protection (Count 4)

Khudaynazar asserts a "class of one" equal-protection claim against the City, alleging that she was intentionally treated differently from others who were similarly situated.  [Compl. ¶¶ 89–90]; see also [id. ¶¶ 58–62 (describing alleged comparator employees)].  The City argues for dismissal of this claim on several grounds, including that class-of-one claims are not cognizable in the public-employment context.  [ECF No. 18 at 10–12].

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Most equal-protection claims involve "governmental classifications that 'affect some groups of citizens differently than others.'"  Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008) (quoting McGowan v. Maryland, 366 U.S. 420, 425 (1961)).  Nevertheless, "a plaintiff can bring an equal protection claim as a 'class of one' even where the plaintiff does 'not allege membership in a class or group.'"  Back Beach Neighbors Comm. v. Town of Rockport, 63 F.4th 126, 130 (1st Cir. 2023) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)).  To prevail on such a claim, "the plaintiff must show that 'she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"  Id. (quoting Village of Willowbrook, 528 U.S. at 564).

---

[10] The City does not allege that Khudaynazar has inadequately pleaded causation, see [ECF No. 18 at 8–10], so the Court does not reach the issue.  Decotiis, 635 F.3d at 30 n.7.  But see Borrás-Borrero, 958 F.3d at 36 (affirming dismissal where plaintiff "fail[ed] to allege a single non-conclusory fact linking his suspension to his 'whistlebowing' acts").

However, "[i]n Engquist, the Supreme Court identified one sphere—public employment—in which plaintiffs cannot bring class-of-one equal protection claims at all." Id. at 132.

Khudaynazar does not respond to the City's argument that her class-of-one claim is barred by Engquist, arguing instead that she has sufficiently pleaded comparators. See [ECF No. 30 at 16]. Engquist, however, binds this Court and categorically bars Khudaynazar's class-of-one equal-protection claim. 553 U.S. at 598 ("[T]he class-of-one theory of equal protection does not apply in the public employment context."). Accordingly, the City's motion to dismiss Khudaynazar's equal-protection claim is **GRANTED**.

### 4.    State-Law Retaliation (Counts 8 and 9)

The City moves to dismiss Khudaynazar's Wage Act and employment-discrimination claims based on Khudaynazar's failure to exhaust her administrative remedies prior to filing her complaint. [ECF No. 18 at 13–15]. The City is correct that both the Wage Act and the antidiscrimination statute contain an exhaustion requirement. See Mass. Gen. Laws ch. 149, § 150 (making private civil action available "90 days after the filing of a complaint with the [Massachusetts] attorney general, or sooner if the attorney general assents in writing"); Mass. Gen. Laws ch. 151B, § 9 (making private civil action available "at the expiration of ninety days after the filing of a complaint with the [Massachusetts Commission Against Discrimination], or sooner if a commissioner assents in writing"). Khudaynazar admits that she has not exhausted her administrative remedies and requests that these claims be dismissed without prejudice such that she may replead them once she has exhausted these remedies. [ECF No. at 30 at 18–19]; see also [Compl. ¶ 103 ("K[hudaynazar] has yet to exhaust her administrative remedies.")].

The Court notes that, while the antidiscrimination statute's exhaustion requirement is jurisdictional, Everett v. 357 Corp., 904 N.E.2d 733, 746 (Mass. 2009), the Wage Act's

exhaustion requirement is not, Depianti v. Jan-Pro Franchising Int'l, Inc., 990 N.E.2d 1054, 1062 (Mass. 2013). This means that Khudaynazar's failure to exhaust her employment-discrimination claim would not necessarily require the Court to dismiss it at this stage in the litigation. Wilson v. Entergy Nuclear Operations, Inc., No. 17-cv-10877, 2019 WL 4417771, at *5 n.3 (D. Mass. Sept. 16, 2019) (holding, on motion for summary judgment, that failure to file complaint with state attorney general did not bar Wage Act retaliation claim). But see Jiang v. Tokyo II Steak House, Inc., 616 F. Supp. 3d 167, 176 (D. Mass. 2022) (dismissing Wage Act claim based on failure to exhaust administrative remedies). Nevertheless, because Khudaynazar consents to the dismissal of her Wage Act and employment-discrimination claims, the City's motion to dismiss them is **GRANTED**.

### C.    Claims Against Wu (Counts 5, 6, and 7)

Wu argues that she is entitled to common-law immunity against Khudaynazar's state-law claims. [ECF No. 20 at 5]. She also argues that Khudaynazar has failed to plead facts showing that Wu interfered with her relationship with Emerge, [id. at 11–13], or did anything to violate her privacy, [id. at 10–11], and that her statements about Khudaynazar were not defamatory and not made with actual malice, [id. at 7–10]. Khudaynazar responds that Wu is not entitled to immunity because she acted in bad faith and that she has sufficiently pleaded claims for tortious interference, invasion of privacy, and defamation against Wu. [ECF No. 30 at 16–18].

Under Massachusetts common law, "a public official exercising judgment and discretion, is not liable for negligence or other error during official decision-making, provided the official acted in good faith, without malice, and free of corruption." Bresler v. Muster, 258 N.E.3d 1134, 1146 (Mass. 2025); see also Nelson v. Salem State Coll., 845 N.E.2d 338, 349 (Mass. 2006) (applying immunity where officials "acted in good faith, engaging in activity that was within

their discretion").  There is a "presumption in favor of the honesty and sufficiency of the motives

actuating public officers in actions ostensibly taken for the general welfare."  Najas Realty, LLC

v. Seekonk Water Dist., 821 F.3d 134, 146 (1st Cir. 2016) (quoting S. Bos. Betterment Tr. Corp

v. Bos. Redevelopment Auth., 777 N.E.2d 812, 820 (Mass. 2002)).[11]  "To overcome this

presumption, the plaintiff bears the burden of showing that the officials acted in bad faith or with

malice."  Bresler, 258 N.E.3d at 1146.  "'Bad faith' is more than 'bad judgment or negligence,'

but rather 'suggest[s] a dishonest purpose of some moral obliquity, a conscious doing of wrong,

or a breach of a known duty through some motive of interest or ill will.'"  Id. (quoting Buffalo-

Water 1, LLC v. Fidelity Real Est. Co., 111 N.E.3d 266, 277–78 (Mass. 2018)).  "'Malice'

constitutes 'a wrongful act, done intentionally, without just cause or excuse.'"  Id. (quoting Pino

v. Trans-Atl. Marine, Inc., 265 N.E.2d 583, 587 (Mass. 1970)).

Here, the Complaint does not plausibly allege that Wu acted in bad faith or with malice.[12]

Indeed, Khudaynazar has pleaded very few specific facts about Wu's actions and motivations,

alleging only that: (1) Wu commented publicly that "[i]t is never OK to harm a police officer or

to harm another member of our community," [Compl. ¶ 30]; and (2) "[u]pon information and

---

[11] Khudaynazar argues that this presumption does not apply at the motion-to-dismiss stage, [ECF No. 30 at 17], but cites no authority to support this argument, and it is mistaken.  See, e.g., Bresler, 258 N.E.3d at 1146 (applying presumption at dismissal stage); Najas, 821 F.3d at 146 (same).

[12] The Complaint alleges, in conclusory fashion, that Wu's May 15, 2025, public statement about Khudaynazar "was personal, made in [Wu]'s personal capacity, was in furtherance of her Mayoral candidacy, and not made pursuant to [her] duties as Mayor."  [Compl. ¶ 30]. Khudaynazar does not pursue this argument in her motion-to-dismiss briefing, and the Court rejects it.  See, e.g., Diorio v. Lalacheur, 233 N.E.3d 556 (Mass. App. Ct. 2024) (unpublished table decision) (granting summary judgment to chief of police based on common-law immunity and holding that "chief had discretion to tweet a most wanted poster from his personal Twitter social media page").

belief, . . . W[u] and the C[ity] intentionally caused" her expulsion from Emerge "to punish and deplatform her and quiet any story about . . . Idowu," though Khudaynazar admits that she "does not have direct knowledge of this interaction," [id. ¶ 55].  Even on a liberal reading of the Complaint, these allegations are insufficient to overcome the presumption that Wu acted honestly and in the public interest.  Khudaynazar does not allege, and nothing in the Complaint plausibly suggests, that Wu's anodyne public statement was motivated by a dishonest purpose, and her allegation that Wu caused her expulsion from Emerge appears to be wholly conclusory and speculative.  See, e.g., Sabey v. Butterfield, 720 F. Supp. 3d 82, 93 (D. Mass. 2024) (granting motion to dismiss where complaint "d[id] not allege that [invasion of privacy was] the result of bad faith, malice, or corruption"); Nasir v. Town of Foxborough, No. 19-cv-11196, 2020 WL 1027780, at *9 (D. Mass. Mar. 3, 2020) (granting motion to dismiss where plaintiffs' "generalized and conclusory allegations . . . d[id] not overcome the presumption that the [defendants] were acting in good faith"); Holden v. Barry, 501 F. Supp. 3d 11, 16 (D. Mass. 2020) (granting motion to dismiss where plaintiff did not plead "sufficient facts that any of the defendants acted with a dishonest purpose or any moral obscurity").  Accordingly, Wu is entitled to common-law immunity against Khudaynazar's claims against her.

Even if Wu were not shielded by common-law immunity, Khudaynazar's claims against her would be subject to dismissal for failure to state a claim.  As discussed supra, her tortious-interference claim against Wu is based on pure speculation—she has pleaded no facts suggesting that Wu "knowingly induced a breaking" of Khudaynazar's relationship with Emerge. Blackstone v. Cashman, 860 N.E.2d 7, 12 (Mass. 2007).  Khudaynazar's opposition characterizes her invasion-of-privacy claim as a false-light claim, [ECF No. 30 at 18], but both Massachusetts courts and federal courts applying Massachusetts law have repeatedly refused to

recognize the existence of such a claim.  See, e.g., Vaiano v. Experian Info. Sols. Inc., No. 1:24-cv-12245, 2025 WL 2323521, at *6 (D. Mass. Aug. 12, 2025) ("The Supreme Judicial Court has not yet decided whether Massachusetts recognizes a common law cause of action for invasion of privacy."); Greenspan v. MasMarques, No. 23-cv-10134, 2024 WL 1258062, at *16 (D. Mass. Mar. 25, 2024) (noting that "case law supports th[e] position" that "Massachusetts does not recognize the false light invasion of privacy tort"); Koppel v. Moses, No. 20-cv-11479, 2020 WL 6292871, at *8 n.7 (D. Mass. Oct. 27, 2020) (concluding that "allegation of false light does not, under current Massachusetts law, state a claim upon which relief can be granted" because "[t]he Massachusetts Supreme Judicial Court has studiously refused to recognize the false light invasion of privacy tort").  Finally, Wu's public statement, which was expressly premised on "allegations," is a classic statement of pure opinion that cannot give rise to defamation liability. See Piccone v. Bartels, 785 F.3d 766, 771, 773 (1st Cir. 2015); Yohe v. Nugent, 321 F.3d 35, 41 (1st Cir. 2003).  Accordingly, Wu's motion to dismiss Khudaynazar's claims against her is **GRANTED**.

## IV.    CONCLUSION

For the reasons set forth above, Payne's motion to dismiss, [ECF No. 14], is **GRANTED**.  The City's motion to dismiss, [ECF No. 17], is **DENIED IN PART**, in that Khudaynazar's First Amendment retaliation claim (Count 3) may proceed, but otherwise **GRANTED**.  Wu's motion to dismiss, [ECF No. 19], is **GRANTED**.  The dismissal of

Khudaynazar's claims is without prejudice and with leave to file an amended complaint within fourteen days of this order.[13]

**SO ORDERED.**

February 3, 2026                              /s/ Allison D. Burroughs
                                              ALLISON D. BURROUGHS
                                              U.S. DISTRICT JUDGE

---

[13] Khudaynazar's briefing twice requests leave to replead her claims with the benefit of discovery.  [ECF No. 30 at 16–17].  That is not how this works.  See, e.g., Parker v. Landry, 935 F.3d 9, 18 (1st Cir. 2019) ("The assertion of a need for discovery does not trump the plausibility requirement: a plaintiff must state a plausible claim before she can invoke a right to discovery."). The Court encourages Khudaynazar to be thoughtful about which claims she chooses to replead, and to replead only such claims for which she can cure the deficiencies identified in this order.